IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

# FILED

JUN 1 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

ANTHONY GREEN;
   MOVANT;

   vs.

UNITED STATES OF AMERICA;
   RESPONDENT;

\*   CIVIL NO.:  07-C-50247
\*   CRIM. NO.:  03-CR-50031
\*
\*   JUDGE PHILLIP G. REINHARD
\*
\*

MOVANT'S REPLY TO UNITED STATES' RESPONSE TO
MOTION FILED UNDER 28 U.S.C. § 2255

COMES NOW, ANTHONY GREEN, pro se and hereby files his reply to the answer of the United States to his Motion filed under 28 U.S.C. § 2255, saying as follows.

[1] The Government's Response Is Due To Be Rejected
  And Stricken From The Record And Further Not Be
  Considered In These Proceedings

By order filed December 28, 2007, the government was ordered to respond to Green's 28 U.S.C. § 2255 Motion within 60 days from the date of the order. Thus, a response was due on or before February 28, 2007. However, the government failed to file a timely response.

By order dated April 7, 2008, the government was directed to file a written explanation for its failure to timely comply

with the court's order.

In responding, the assigned prosecutor states that "...the event in his 2007 calendar...were inadvertently not carried over" when "transferring matters from the 2007 calendar to the 2008 calendar...."  The assigned prosecutor further states that "Because of the number of crack resentencing matters assigned to the undersigned Assistant, the Assistant has not yet conducted a case review in 2008, which would have disclosed the lack of calendaring...."  [see Government's Response @ p. 3]  These are the reasons given for failure to file a timely response.

Movant Green replies that these reasons must be rejected and the entire answer of the government stricken from the record and not considered in these proceedings.  Green asserts that, with the vast resources at the government's disposal, that the reasons given should not have occurred.  Green further submits that, at a bare minimum, that the assigned prosecutor could have, and should have, filed a motion for extension of time, so advising this court.  The prosecutor must be responsible for his actions, or inactions, when dealing in the criminal area of law.  This is particularly true because defendants, such as Green, has a vested interest in the timely processing of his § 2255 Motion, as he raises claims which if true, could result in his release, or a sentence reduction.

For these reasons, Green respectfully submits that the answer of the government is due to be rejected.

[2]   Green's Claims of Prosecutorial Misconduct Were Not
      Raised On Direct Appeal And Are Properly Raised In
      These Proceedings

In his § 2255 Motion, Green asserted that the prosecutor committed misconduct by (i) introducing Exhibit 20 and the testimonies from numerous witnesses regarding his identification therefrom, and (ii) by failing to tender the notes and/or reports of Deffenbaugh.  [see Memorandum @ p. 28]

The government responds that "Green's claim that the government introduced evidence of his prior bank robbery was raised, and rejected, on direct appeal."  [see Government's Response @ p. 4]

Movant Green replies that the government has mis-stated the facts.  On direct appeal, Green, through counsel, argued "that the pretrial identifications based on the photo arrays should have been suppressed."  [see United States v. Anthony Green, No. 04-1723, at p. 4 (a copy attached hereto as Exhibit A)]  This claim is materially different from the claim asserted in the § 2255 Motion/Memorandum as the § 2255 claim involves the claim that the evidence introduced was in fact evidence of a prior robbery, which was excluded by court order, and the appeal issue involves the suppression of the photo arrays.  Accordingly, Green's § 2255 claim that the government committed misconduct by introducing Exhibit 20 into evidence, while knowing that same was evidence from a prior robbery/prosecution and while further knowing that

-3-

that same was precluded by court order.  Accordingly, the claim
was not raised and considered on appeal and is further properly
raised in these proceedings.

The government further states as follows:

> "The claim fails factually as well.  Green
> claims evidence of his prior bank robbery
> came in through Government exhibit 20 and
> the testimony of witnesses who reviewed that
> photo array....This Court ordered that the
> government could not introduce evidence of
> the defendant's commission of the prior bank
> robbery....it did not bar use of a photograph
> of the defendant taken on a prior occassion
> for any other purposes.  There was no evidence
> at trial linking the defendant's photograph
> with the prior bank robbery, and no evidence
> of the prior bank robbery was elicited at
> trial."

[see Government's Response @ p. 4]

Green replies that the evidence will show (i) that Exhibit
20 is a photo array that was taken in July 1999, (ii) that Exhibit
20 was used in the 2000 bank robbery, [see Exhibit B attached
hereto] (iii) that Exhibit 20 was introduced into evidence during
the 2000 bank robbery trial, where Green was acquitted, (iv) that
Exhibit 20 is a identical copy of the photo array taken in 1999,
and used during the 2000 trial and further entered into evidence
during that 2000 bank robbery trial, [see Exhibit B attached hereto],
and (v) that Exhibit 20 as introduced, was taken in 1999 by Det.
A. Marney, re-used By Det. A. Marney during the 2000 bank robbery
investigation/prosecution, and finally used by Det. A. Marney
for the current prosecution.  [compare Exhibit B with Exhibit C]

Green submits that the government's Exhibit 20 is indeed evidence that was not only used in a prior bank robbery, but introduced in the 2000 bank robbery trial.  Green further submits that the government well knew these facts, and nontheless caused the exhibit to be introduced in clear violation of the court's order.  Exhibit 20 was shown to to at least two witnesses for their identification of Green.

The government further responds that "[I]n his direct appeal, Green claimed the government failed to turn over notes of FBI DNA technician Debra Deffenbaugh...." [See Government's Response @ p. 5]

Green replies that he "...argue[d] for the first time on appeal that his Sixth Amendment right to confrontation was denied when Rhonda Craig was permitted to testify about Deffenbaugh role in the DNA testing... [and further argued that] he should have been given Deffenbaugh's reports and notes...." [see Exhibit A @. p. 5]  In evaluating this claim, the appeals court employed a plain error review because no objection was lodged in the district court.  Because the claim was inartfully argued by counsel, the court found no plain error.  Green submits that the failure to disclose is the calculated result of prosecution misconduct, a claim not asserted, nor reviewed on appeal.

The government further states that "...Defense counsel neither requested Deffenbaugh's notes nor subpoenaed her, .."

Green replies that the notes were included in the government's

duty to disclose evidence favorable to the defense. Green further responds that counsel's failure to investigate and to call this witness constitutes ineffective assistance of counsel.

The government further responds that "....The record does not reflect that the notes were exculpatory, much less 'material' to the defense..." [Government's Response @ p. 5]

Green replies that the notes were indeed material to his defense. During her testimony, Craig testified that "...we try to use a set amount of DNA in every PCR reaction, and our target amount that we want to use for every reaction is one nanogram. As the attorney just said, it's one one-billionth of a gram of DNA. That'a our target amount that we want to have." TR Vol III @ p. 789.

Specifically, Craig only testified as to the amount of DNA that was extracted from Q4 sample [sweatshirt] and did not testify as to any amount of DNA extracted from Q5 [hat] and Q6 [skull wrap]. see id. @ pp 790- 795. Further, Craig did not testify whose notes she was referring to. see id. @. 790.

Green submits that the notes could have, and would have assisted him in preparation for cross examination regarding the amount of DNA extracted from Q5 and Q6 samples, and would have further served to specifically identify the notes relied on by Craig. The notes could have further served to call into question whether Green was a major contributor as it relates to the Q4 sample taken, in light of the fact that no DNA samples were

-6-

extracted  from the remaining items.

The government finally responds that "...[E]ven if the notes were relevant, missing a minor impeachment opportunity does not mean the result would have been different or rendered the outcome unfair...." [see Government's Response @ p. 5]

Green replies that the notes were indeed material, and that they would have served to call into question the entire DNA testimony given by Craig.  Green submits that it is impossible to determine the weight a jury would have given, based on the notes and the testimony therefrom.  What is well established in the law, in that the government has a duty and obligation to disclose the notes, and the failure to do so constitutes prosecutorial misconduct.

[3]  Green Was Denied His Sixth Amendment Right To The
      Effective Assistance Of Counsel

[A]  The government responds that "...[I]n any event, Green has not shown that any evidence obtained during any search of the defendant's residence was introduced at trial." [see Government's Response @ p. 8]

Green replies that evidence was seized that was instrumental in the government's investigation, and directed the prosecution of Green.  A review of the inventory sheets, will establish that "Miscellaneous Parers" were seized.  Green submits that the miscellaneous papers were transcripts from his 2000 criminal

for bank robbery.  These transcripts directed the government to the photo array, which was introduced as Government's Exhibit 20.  As such, evidence obtained was indeed submitted/introduced during the trial, specifically through Exhibit 20.

The government further responds that "[R]egardless of how Mr. Flynn viewed the May 9, 2003, search, it had no impact upon the trial, much less 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'"  [see Government's Response @ p. 5]

Green replies that under Strickland, counsel has the duty to bring to bear such skills and knowledge as will render the trial a reliable adversarial testing process, and must, at all times, advocate the defendant's case and cause.  id. 466 U.S. 668.  In this regard, counsel did not provide adequate assistance by failing to file a proper suppression motion.

[B]  The government responds that "...[A]s noted above, on direct appeal the Seventh Circuit found this issue to be so lacking in merit as to not warrant discussion."  [see Government's Response @ p. 9]

Green replies that his claim of ineffective assistance of counsel as identified herein, was never presented to the Seventh Circuit Court of Appeals for review.  Green further replies that his claim on appeal involved the suppression of the photo arrays and found that "Green failed to establish that either photo array

-8-

was unnecessarily suggestive." [see Exhibit A @ p. 4]  Green further replies that his claim is predicated upon the fact that government's exhibit 20 is evidence from a prior bank robbery which the court specifically ordered that no evidence of a prior bank robbery may be used..

The government further responds that "[T]hus, it could not have been evidence, or even derived from evidence, of the bank robbery." [see id.]

Green replies that government's exhibit 20 is the same identical photograph taken in 1999, the same identical photograph used during the 2000 prosecution, and the same identical photograph that was introduced during the bank robbery trial in 2000. Thus, not only was the exhibit derived from evidence of the bank robbery, it was evidence taken from the 2000 bank robbery trial. [see Exhibits B and C]

The government further responds that "[M]oreover, at trial the photograph was never linked in any way to a prior bank robbery." [see id.]

Green resplies again, that the photograph is the identical photograph used during the 2000 bank robbery prosecution.  Green has submitted documented evidence to prove this fact.  [see Exhibits B and C]

The government further responds that "[C]ounsel is not ineffective for not making a frivolous objection." [see id.]

Green replies that under Strickland, counsel has a duty

to conduct a reasonable investigation into the facts and law
involved.  id. 466 U.S. 668  In this case, counsel did not inv-
estigate the evidence presented during the prior bank robbery
to insure that none of the evidence would be used to taint the
current trial.  The failure of counsel in this regard, permitted
the government to introduce and use a photographic lineup which
was the same evidence used during the 2000 bank robbery trial.

[C]  The government responds that the "issue of identific-
ation was also one of the three issues that the Seventh Circuit
mentioned.  It, like this Court, found that the photo array was
not unnecessarily suggestive." [see Government's Response @ p.
9]

Green replies that the government mis-construes his claim.
Green claims that Exhibit 20 is identical evidence introduced
at the 2000 bank robbery trial, which was excluded by order of
the court.  The government introduced this evidence, without
objection, and used where testimony was ascertained from numerous
witnesses regarding the photo array.  As such, Green argues that
because this is evidence from a prior robbery, that any testimony
therefrom should have been objected to.  Green further replies that
the Court of Appeals never considered his claim of ineffective
assistance of counsel in this regard.

[D]  The government responds that "[B]y failing to identify
the substance of the witnesses' purported testimony, Green has not

-10-

shown prejudice." [see Government's Response @ p. 10]

Green replies that the government again misconstrues his argument. Green claimed that counsel should have interviewed the government's witnesses so as to ascertain their testimony and to assist in the preparation of the defense. Accordingly, Green submits that he need not show any "purported testimony" as the purpose was to gather "purported testimony" from the government's witnesses.

[E] The government responds that "Green raised the Confrontation Clause issue in his direct appeal and the Seventh Circuit rejected his claim." [see Government's Response @ p. 10]

Green replies that, while the Court of Appeals addressed the Confrontation Clause issue, it did not address the issue that Craig's testimony was inadmissible evidence nor the claim of ineffective assistance of counsel in this regard.

[F] The government responds that "...the issue of any reports or notes that may have been prepared by Ms. Deffenbaugh was raised by Green in his direct appeal as a part of his Confrontation Clause argument." [see Government's Response @ p. 10]

Green replies that the claims were reviewed under the heighten standard of plain error review, because counsel failed to investigate and to object, failed to explain prejudice as well as a failure to explain the significance of the notes.

The government further responds that "[E]ven if attorney Flynn should have requested Ms. Deffenbaugh's notes, there is

-11-

nothing to suggest that Green was prejudiced or the trial result was affected by any lapse...." [see Government's Response @ p. 11]

Green replies that the notes would have served to impeach Craig as her testimony was based on findings by Deffenbaugh.

[G]  The government responds that "[S]uch testimony would have had a marginal effect at best." [see Government's Response @ p. 11]

Green replies that this evidence could have established a reasonable doubt in the mind of a juror, and possible the entire jury.  The effect cannot by no means be measures by a assistant United States attorney, after the fact.

[H]  The government responds that "Again, Green fails to make a comprehensive showing of what facts an additional invest-igation would have uncovered...or what testimony Ms. Mack would have given...." [see Government's Response @ p. 13]

Green replies that, in his Memorandum, he clearly identified the facts that would have been uncovered and what the testimony would have been, and further presented a "Supplemental Report" which could have been introduced through the testimony of Tanisha Mack.  [See Memorandum @ pp21, 22 and Exhibit C]

[I]  The government responds that "[A]ttorney Flynn already had received a copy of the complaint and affidavit originally charging Green with bank robbery.  Included in that complaint is an affidavit from an FBI Special Agent stating that he had been

-12-

advised by bank officials that the deposits of the bank were insured at the time of the robbery.  Attorney Flynn was justified in relying upon that."  [Government's Response @ p. 13]

Green replies that a review of the evidence will establish that the insurability of the bank on the date in question, is debatable.  First, by letter dated December 12, 2003, the Executive Secretary of FDIC advised AUSA Love that the bank was insured on March 8, 2003, and that additional documents is provided.  [see Exhibit D]  Exhibit D further establishes that the bank was insured from August 9, 1989 through and including March 8, 2003.  [see id.]  However, the actual certificate shows an issuance date of January 30, 1992, before the robbery.  [see Exhibit D attached to § 2255 Memorandum]  Because the issuance date of the certificate is in dispute, the entire certificate should not have been stipulated to because of this fact.  The court instructions and the actual instructions to the jury, advised them that whether the bank was insured on the date in question is an element of the offense.  [see Proposed Jury Instructions and Jury Instructions]  Accordingly, counsel was ineffective in this regard.

[J]  The government responds that "Green fails to identify any evidence that was not produced that was favorable to him." [see Government's Response @ p. 14]

Green replies that the record makes clear that green was not given the notes that was taken by Deffenbaugh and introduced through Craig.  The record further makes clear that the notes

-13-

were indeed favorable to Green's defense and further that the government failed to disclose them.

The government further responds that "[T]here was indication that Ms. Deffenbaugh's notes were favorable to Green or that anything out of the ordinary was contained in the notes." [see Government's Response @ p. 15]

Green replies that the notes will speak for themselves, as it relates to specific amounts of DNA.

The government further responds that "[G]reen's hope that additional materials may exist does not establish prejudice." [Government's Response @ p. 15]

Green replies that he knows for a fact that additional materials exist which will establish prejudice, and to support this conclusion, Green seeks the notes in these proceedings.

[K]  The government states that the court advised Green about his rights to testify [see Government's Response @ n.11] to which Green responds that the law imputes this duty upon counsel and further mandates that counsel accurately advise his client about testifying, a detail not effected by counsel.

(i)  The government responds that "[T]he only mention at all of a plea agreement for Green was in a letter from the government to Mr. Flynn sent shortly after indictment in which the government discussed discovery for several pages and then briefly mentioned the timing of any possible plea agreement." [see Government's Response @ p. 17]

-14-

Green submits that the response of the government indicates that a plea agreement was offered for consideration. Green avers that counsel did not tell him about the correspondance referenced by the government, nor discussed any plea with him at all.

The government further responds that "[A]s no offer, firm or otherwise, was ever extended by the government, Mr. Flynn's duty to inform Green of an offer was never implicated." [see Government's Response @ p. 17]

Green replies that this response contradcits the previous response of the government that "briefly mentioned the timing of any possible plea agreement." Green further replies that counsel had a duty and obligation to investigate and advise him as to what pleas should be entered.

(ii) The government responds that "[T]he government was not interested in having a violent criminal like Green escape punishment," [see Government's Response @ p. 17] yet it "...mentioned the timing of any possible plea agreement...." [see id.]

The government further responds that "...even had Green entered into a 'blind' plea agreement without an offer from the government, he is unable to show that he would have received a more favorable sentence by virtue of a three-level reduction for acceptance of responsibility under Guideline 3E1.1." [see Government's Response @ p. 17]

Green responds that a there is a reasonable probability that

-15-

had counsel investigated the possibility of a plea offer, that the government would have offered one without hesitation. A plea agreement would have saved the government vast resources which could have been better used elsewhere. It is further reasonable concluded that had Green entered a socalled "blind" plea that the court would have granted a reduction for acceptance of responsibility.

The government further responds that "[A] mere possibility of a lower offense level is not enough to demonstrate actual prejudice." [see Government's Response @ p. 18]

Green replies that the United States Supreme Court would adamently disagree with this response. In United States v. Glover, 531 U.S. 198 (2001) the Supreme Court stated that "any amount of actual jail time has Sixth Amendment significance," which constitutes prejudice for purposes of Strickland, test.

In Glover the defendant claimed that counsel was ineffective by failing to assert entitlement to a guideline which, if granted, would have reduced the guideline range by 6 to 21 months. The Court found this sufficient to establish prejudice and that counsel was ineffective in this regard. In Green's case, the guideline range would have been reduced by more than seven (7) years. As such, sufficient prejudice has been established.

[iii]  The government states as follows:

"Green adds to his argument that had he known of the Sentencing Guidelines, he would have plead guilty. As noted above, upon conviction

-16-

> he would be (and was) sentenced as a Career
> offender and an Armed Career Criminal. No
> plea agreement would have changed that. Any
> hope for a reduction in his offense level
> for acceptance of responsibility is just
> that: hope. It does not take the place of
> demonstrating actual prejudice."

[see Government's Response @ p. 18]

Green replies that, the government continues to mis-state his claim(s). In his Motion/Memorandum, Hreen specifically stated that "...had counsel fully advised him as to the strength of the government's case, advised him as to the possible sentences involved with a conviction enter by guilty plea or jury verdict, and advised him as to the application of the Federal Sentencing Guidelines, that he would have plead guilty." [see Memorandum @ p. 26] The record makes clear that Green does not claim that he would have plead guilty simply by "know[ing] of the Sentencing Guidelines" but rather that had counsel advised him of the possible sentences, under the guidelines as it relates to a conviction entered by guilty plea as opposed to jury verdict.

Green further replies that, under the guidelines, whether he was sentenced as a Career Offender, under U.S.S.G. § 4B1.1, or as an Armed Career Criminal, under U.S.S.G. § 4B1.1, that both provisions provided for the applicable reduction in the offense level for accepting responsibility. see § 4B1.1(B)* and 4B1.4(b)(3)(B)*. As such, his offense level would have been reduced by 3 levels for accepting responsibility, else a trip to the appeals court would have been taken to review the denial.

-17-

Green finally states that this is sufficient evidence to establish prejudice under <u>Glover</u>.

[iv] The government states that "[G]reen claims Mr. Flynn never recommended that Green plead guilty.  Assuming such to be true..." [see Government's Response @ p. 18]

Green replies that this court should not resolve this claim based of the government's erroneous "assumption", when counsel may be made available to establish the <u>fact</u> that counsel was indeed ineffective in this regard.

The government further states that "[W]ithout an offer from the government to cooperate, Mr. Flynn's recommendation to proceed to trial, if such a recommendation was made, was not outside the wide range of reasonable professional assistance." [see Government's Response @ p. 19]

Green replies that without an affidavit from counsel, or other communication from counsel on the issue, that the government's unsupported and erroneous conclusion(s) are insufficient to resolve the issue.  Let's ask counsel at a evidentiary hearing. Green's claim is sufficiently stated in the Motion, Memorandum and his Affidavit.  The government presents no evidence whatsoever to support its position.

[L] The government responds that "[T]here is nothing in the record indicating Green was unaware he could testify." [see Government's Response @ pp 19, 20]

Green replies that that is the purpose of these proceedings,

-18-

to establish the record regarding counsel's failure to const-
itutionally advise Green about his rights to testify, and further
that thedecision was his and his alone.  A hearing will establish
that counsel was clearly deficient in this respect.

The government further responds that "Green alleges that
Mr. Flynn advised him not to testify." [see Government's Response
@ p. 20]

Again, the government mis-states the claim.  Green alleged
that "Counsel advised Green that he should not testify." [see
Memorandum @ p. 27]

The government further responds that "[T]hat is the purpose
of counsel:  to give advice, particularly in trial strategy,
even though the final decision to testify lies with the defendant."
[see Government's Response @ p. 20]

Green replies that he complied with counsel's advice, "...not
knowing that the decision was his and his alone" as counsel never
made this fact aware to him. [see Memorandum @ p. 27]

The government further states that "...the focus is on whether
Green was prevented from testifying....he was not prevented" this
right. [see Government's Response @ p. 20]

Green replies that the advise given to him effectively denied
him the right to testify.

[3]  A Evidentiary Hearing Is Most Certainly Required Hereon
The government responds that "...the issues may be resolved
without the need for an evidentiary hearing." [see Government's

Green replies that, because his claims are properly raised for the first time in a § 2255 proceeding, see McCleese v. United States, 75 F.3d 1174 at 1178 (and cases cited therein)(7th Cir. 1996)) and because the record must be supplemented with "extrinsic evidence that illuminates the attorney's errors" see id; Bond v. United Sttaes, 1 F.3d 631, 634 (7th Cir. 1993) that a hearing is required.

Green further replies that he has presented evidence and sufficient argument to support each claim asserted. However, the government files an unsupported response attempting to assume counsel's position on each claim, and filing a late unsupported and erroneous response. None of the assertions or responses of the government are supported by any record. This is the reason Green submits that a hearing is required. Counsel should be called upon to answer each "act" or "omission" asserted. This is particularly true in light of the fact that the government presents to reply affidavit from counsel, and Green would submit that the reason for this is that counsel would have had to admit his own deficient performance.

Green further replies that many of the allegations are not a part of the "files and records" of this case, but involve communication, or lack of communication, between he and his attorney. The government was not a part of these attorney/client communications and any response regarding same must be dismissed as unsupported and erroneous.

-20-

Green finally replies that <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) requires that this court have a duty in these proceedings to ask the attorney to provide an explanation for the challenged conduct, before determining whether counsel's performance is/was reasonable.  Green submits that this may only be accomplished following a hearing.  Anything legg than a hearing would be a miscarriage of justice inconsistent with the rudimentary demands of fair procedure.

### CONCLUSION

WHEREFORE, based upon the foregoing, Green prays that this court will grant him the requested, alternatively,he prays that a evidentiary hearing will be granted whereas he may fully establish the record regarding the merits of his claims and his entitlement to relief.

Respectfully submitted this 29th day of MAY         ,2008.

*Anthony Green*
ANTHONY GREEN, PRO SE
REG. NO. 12450-424
FCI-ATLANTA
P. O. BOX 150160
ATLANTA, GA  30315

### CERTIFICATE OF SERVICE

I, the undersigned, certify that I have on this 29th day of May 2008 served a true and correct copy of the foregoing "Movant's Reply To United States' Response To Motion Filed Under 28 U.S.C. § 2255" upon the government by dropping same in the mail, proper postage affixed thereto and addressed to United States Attorney's Office,, Northern District of Illinois, 308 West State Street, Room 300, Rockford, Illinois 61101.

Signed under penalty of perjury this 29th day of May 2008.

*Anthony Green*
ANTHONY GREEN, PRO SE

# EXHIBIT

# A

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**
*(Submitted September 22, 2005*)*

Decided October 11, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 04-1723

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*, | Appeal from the United States<br>District Court for the<br>Northern District of Illinois,<br>Western Division. |
| *v.* | |
| ANTHONY GREEN,<br>*Defendant-Appellant.* | No. 03 CR 50031-1<br><br>**Philip G. Reinhard**, *Judge*. |

### O R D E R

A jury found Anthony Green guilty of armed bank robbery, 18 U.S.C. § 2113(a), (d); possession of a firearm during and in relation to the robbery, *id.* § 924(c); and possession of a firearm by a felon, *id.* § 922(g)(1), and in March 2004 he was sentenced as a career offender to a total of 384 months' imprisonment. Green is represented by

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

counsel in this appeal, but we have also allowed him to file a pro se brief raising additional arguments.

In May 2003 a black male entered the Union Savings Bank in Freeport, Illinois, walked up to teller Linda Graves, and handed her a note demanding money. The man drew a gun and reached for a stack of currency on the counter; Graves instinctively slapped his hand but then backed away. The gunman then grabbed $6,000 from the counter and fled. Witnesses stated that the gunman was wearing a red baseball cap over a "skull wrap," clear plastic safety goggles, and a blue hooded sweatshirt. The robber was seen fleeing on foot through the bank parking lot and across the street. Minutes later, a few blocks away, another eyewitness saw a man fitting the robber's description get into a car. In that same vicinity the police located together on the ground a red hat, a black skull wrap, plastic safety goggles, a blue sweatshirt, a loaded revolver, and three bundles of money totaling $5,940.

Shortly after the robbery, police matched the witnesses' description of the getaway car to one owned by Nelson Kennedy. After stopping the car, which was occupied only by Kennedy's girlfriend, officers found two guns in the trunk, neither of them matching the description of the gun used during the bank robbery. Police then went to Kennedy's home and questioned him about the robbery. He was unaware at this point that his car had been seized. Initially Kennedy denied any involvement in the robbery, but later he voluntarily went to the police station where he confessed to being the getaway driver and implicated Anthony Green as the gunman.

Investigators afterward used two separate photo arrays in attempting to confirm that Green was the robber. The first array was comprised of six color mug shots all showing black males with facial hair. Three of them wore white shirts, while the other three wore colored shirts. Upon viewing this array, no eyewitness was able positively to identify Green as the robber, though Linda Graves did narrow the selection down to Green and one other man. Graves said that the picture of Green resembled the robber because of his eyes, but she added that the man in the photo appeared heavier than the robber. In fact, the photo of Green used in this first array had been taken a few years earlier when Green was 20 pounds heavier. The eyewitnesses were then shown a second photo array a few weeks after the robbery; this time the array included pictures of Green and five other black males who were not depicted previously. All six men had facial hair; four wore white shirts, Green wore a colored shirt, and the shirt worn by the last man could not be seen. Linda's son Michael Graves, who was near the bank in his truck at the time of the robbery and saw the gunman flee, was shown the loose, color photos comprising the new array but did not positively identify Green. Like his mother, though, he stated that the photo of Green resembled the robber based on the "eyes and

the eyebrows." Later both Linda and Michael Graves were shown a black-and-white photocopy of the second array with the photos now arranged in a matted folder. This time both witnesses positively identified Green.

Green and Kennedy were then indicted. Before trial Green moved to suppress the photo identifications by Linda and Michael Graves, contending that the procedures used were impermissibly suggestive. Green, without distinguishing between the arrays, argued that they unfairly contrasted pictures of him dressed in a colored shirt against younger men with lighter complexions wearing white T-shirts. He also argued that it was unfair that he was the only man pictured in both arrays shown to Linda Graves, and that a newspaper article describing the robber infected the photo identifications. The district court denied Green's motion, reasoning that Green did not appear significantly older or have a significantly different complexion than the others, and that too little of Green's colored shirt was visible to be significant. The district court found Green's other arguments unconvincing.

Meanwhile, Kennedy, who was released on bond, was arrested again. The district court ordered him detained after finding probable cause to believe that he violated the conditions of his release based on information that he and another man were seen fleeing from a home where shots were fired and then led police in a 20-minute car chase. According to the government, two empty rifle casings were found at the house. Five weeks later Kennedy executed an agreement calling for him to plead guilty to bank robbery; in that agreement the government stipulated that, up to that time, Kennedy had "clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct" that warranted a three-point decrease in offense level under U.S.S.G. § 3E1.1. Kennedy entered his plea, and approximately eight weeks later executed a second agreement binding him to cooperate against Green in exchange for a possible sentence reduction pursuant to U.S.S.G. § 5K1.1.

At trial Linda Graves was the only witness to identify Green in the courtroom as the robber. She also recounted that when shown the first photo array she had said that the picture of Green resembled the robber, and that when shown the second array she had picked him out with certainty. Michael Graves also testified about his earlier reactions to the photo arrays, but he was not asked to identify Green in court. Several other witnesses acknowledged seeing the arrays, but none said that they had identified Green as the robber.

The government also called Kennedy, who admitted his role as the get-away driver but implicated Green as the instigator and gunman. Before trial the government had moved in limine to prevent cross-examination about Kennedy's violations of pretrial

release; the dismissal of a count charging him with violating 18 U.S.C. § 922(g); his possession of the two guns found in his car when it was seized shortly after the robbery; a prior misdemeanor conviction for domestic battery; and his prior drug use. The government argued that the events leading to revocation of Kennedy's pretrial release did not relate to his truthfulness and would be used only to "dirty up" the witness. Green responded that the new arrest was relevant because it gave Kennedy greater motivation to cooperate with the government since he still faced liability for criminal activity committed while out on bail. The district court granted the government's motion, reasoning first that the actions leading to the bond revocation were not a proper inquiry for cross-examination, because the government had not promised Kennedy that he would not be prosecuted for those crimes. The court also found that Kennedy was not promised that he would not be prosecuted for possessing the two guns found in his car shortly after the bank robbery. Cross-examination about these guns was also excluded because there was no evidence that either gun was used during the robbery. The court noted that "a subjective fear that a person might have some consequence as a result of criminal activity" will not cause bias sufficient to open a matter for cross-examination. Rather, the court said, there must be "an actual promise by the government" not to prosecute.

Rhonda Craig, a forensic DNA examiner for the FBI, testified for the government as an expert regarding genetic material collected from the blue sweatshirt found beside the gun, goggles, skull wrap, and money. Without objection, Craig offered her opinion that Green was the major contributor to DNA found on the sweatshirt, even though it was Debra Deffenbaugh, an FBI technician working under Craig's supervision, who actually extracted and analyzed the DNA sample from the sweatshirt. Green received a copy of Craig's report in advance of trial but did not request or receive reports or notes prepared by Deffenbaugh.

Finally, Green's former supervisor at a plastics manufacturer testified that the safety goggles recovered near the bank were the same type the company used.

In this appeal Green argues through counsel that he is entitled to a limited remand pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), and *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). In his pro se supplemental brief, Green adds several more arguments, only three of which merit discussion. We start with Green's arguments.

First, Green renews his argument that the pretrial identifications based on the photo arrays should have been suppressed. We agree with the district court, however, that Green failed to establish that either photo array was unnecessarily suggestive.

*See United States v. Donaldson*, 978 F.2d 381, 384-86 (7th Cir. 1992). In both arrays the other black males depicted had short hair and facial hair similar to Green's. *See United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998). The others in the first array do not appear significantly younger or older than Green, while in the second array three men were younger while two were older than Green. *See id.* Moreover, using a picture of Green in a colored shirt did not render the arrays suggestive. *See Donaldson*, 978 F.2d at 384-86. No feature in the pictures impermissibly pointed to Green as the robber.

Next, Green argues for the first time on appeal that his Sixth Amendment right to confrontation was denied when Rhonda Craig was permitted to testify about technician Deffenbaugh's role in the DNA testing. Craig testified that she supervised Deffenbaugh in the laboratory and, using Deffenbaugh's DNA extractions and lab results, concluded that Green was the major contributor to DNA found on the blue sweatshirt. Green also argues that he should have been given Deffenbaugh's reports and notes because, he contends, these materials were "exculpatory." Because these arguments are raised for the first time on appeal, our review is for plain error. *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000).

Although experts may not simply summarize out-of-court statements made by others, experts may form their own opinions relying on material commonly used by others in the field, including materials prepared by others. *United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989). The right to confrontation is not automatically violated whenever "non-testimonial" hearsay is admitted without the opportunity to examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Particularly in the domain of chemical and other scientific analysis, where it is rare that an expert's opinion will not rely on information gathered out of court, experts may testify regarding analyses performed by other technicians without a need for the technician to be available for examination. *See United States v. Abbas*, 74 F.3d 506, 512-13 (4th Cir. 1996); *Reardon v. Manson*, 806 F.2d 39, 42 (2d Cir. 1986). Moreover, although it is not clear to what extent Deffenbaugh's materials were made available to Green for cross-examination, *see* Fed. R. Evid. 705; *Smith*, 869 F.2d at 355, Green does no more than speculate that the materials would have assisted him, and fails to explain how he was prejudiced by not gaining access to them. *See United States v. Alwan*, 279 F.3d 431, 438-39 (7th Cir. 2002). Accordingly, we are not persuaded that plain error was committed in the handling of Craig's testimony.

Green's last pro se argument is that the district court unduly restricted his cross-examination of Kennedy regarding the guns found in his car the day of the robbery, his later criminal conduct while on pretrial release, and his ability to win agreement from

No. 04-1723

the government that he should get a reduction for acceptance of responsibility after incurring new charges while on bond. The district court limited inquiry into these areas because the guns found in the trunk of Kennedy's car on the day of the robbery were not connected to the bank robbery, and because the government had not promised Kennedy that he would not be prosecuted for possession of those guns or his actions leading to the bond revocation. The court did permit cross-examination of Kennedy about the § 5K1.1 agreement, but Green insists that it was necessary also to question Kennedy regarding the guns in his car, the violation of his release conditions, and the acceptance reductions so that the jury could fully assess Kennedy's motivation to lie to curry favor from the government. But given the other evidence of Green's guilt in this case, we agree with the government that any error in limiting this cross-examination is harmless. *See United States v. Sasson*, 62 F.3d 874, 885 (7th Cir. 1995).

Finally, Green through counsel raises a *Booker* claim. Green failed to raise the argument in the district court, so our review is for plain error. *See Paladino*, 401 F.3d at 481. Here the government concedes that a limited remand is warranted to ask whether the district court would have decreased Green's sentence had it known the sentencing guidelines are merely advisory. *See id.* at 483-84. We thus direct a LIMITED REMAND pursuant to the procedure set forth in *Paladino*.

# EXHIBIT
# B

## FREEPORT POLICE DEPARTMENT
## SUPPLEMENTARY REPORT

| Report # 00-17896 | Date of Report 8/3/00 | Report by Det. A. Marney |
|---|---|---|
| Victim Union Savings Bank | Offense(s) Robbery | Suspect(s) Anthony Green |

This investigative report reflects the contents of an interview with **Gary R. Richards, DOB 1/14/66, of 204 Meadow Dr., Orangeville, IL, PH #789-4066**, in regard to the above listed case. This interview was conducted by Det. Marney on 8/10/00 at the Freeport Police Department.

Gary advised that on the morning of the Union Savings Bank robbery, he was driving westbound on Stephenson St. and was stopped at a red light at Galena Ave. At that time, Gary noticed there was a black male running eastbound on Stephenson on the sidewalk along the south side of Stephenson Street. Gary said he watched the subject as he was running directly toward him and then proceeded on past, still going eastbound on Stephenson in front of Old Kent Bank. Gary noticed that the subject was wearing a dark colored cap, a blue Wil-Kleen work shirt, and blue pants. Gary described him as a black male from 30 - 40 years of age, about 5'8", with a thin build. Gary saw the subject's face as he ran past and thought that he might be able to identify him if he sees him again. Moments after this subject ran by Gary, Gary saw police detectives run up to the front of the bank and knew that something had just occurred. I showed Gary a photo line-up consisting of the following six photographs:

1. LaShawn Thurman
2. Damon Davis
3. Anthony Green
4. Kenneth E. Reed
5. Jason E. Cain
6. Jermaine C. Tidwell

Gary viewed the photographs but was unable to say that anyone depicted in the line-up was the same person he saw run past him that morning.

00-17896e

| Detective *Albert Marney* | Date 8-17-00 | Supervisor Approval | Date |
|---|---|---|---|

# EXHIBIT

# C

# Freeport Police Department
## Supplementary Report

| Case# 03-9777 | Date of report 5-8-03 | Detective Det. A Marney |
|---|---|---|
| Complainant/Victim Union Savings Bank | Offense(s) Armed Robbery | Suspect(s) Anthony Green, Nelson Kennedy |

This investigative report reflects the contents of an interview with **Linda M. Graves, DOB** ▮▮-44, of ▮▮▮▮▮, **Freeport, Telephone** ▮▮▮▮, in regard to the above listed case. This interview was conducted by Detectives Marney and Summers on 5-8-03 at 1132 W. Stephenson St. in Freeport.

I met with Linda to show her a photo line-up to see if she could identify the man who robbed her while she was working as a teller at Union Savings Bank earlier that day. Before I showed her the photographs, I advised her that the suspect may, or may not, be included among the photographs and that she should not feel compelled to point out someone if she didn't recognize that person based on her own recollection. Linda said that she understood that. I showed Linda the photo line-up, which consisted of the following six photographs:

1. Lashawn Thurman
2. Damon Davis
3. Anthony Green
4. Kenneth Reed
5. Jason Cain
6. Jermaine Tidwell

Linda looked at each photograph and said that the person depicted in photo 3 looked most like the man who robbed her but she could not say with any certainty that he is actually the same person. Linda said the man in the photograph appeared to have a larger build than the man she remembered at the bank.

03-9777b

| Detective signature _Alfred Marney_ | Date 5-8-03 | Supervisor signature _Sgt. Curt Witt_ | Date 05-23-03 |
|---|---|---|---|

# EXHIBIT

# D

**FDIC**
**Federal Deposit Insurance Corporation**
550 17th St. NW Washington DC, 20429

**DEC 1 7 2003**

Executive Secretary

73703-00119

Mr. Michael D. Love
Assistant U. S. Attorney
United States Attorney's Office
308 West State Street, Room 300
Rockford, Illinois 61101

DEC 1 2 2003

Dear Mr. Love:

By letter dated December 10, 2003, you requested proof of the insured status of Union Savings Bank, Freeport, Illinois, at the time of a robbery at its branch located at 715 West South Street, Freeport, Illinois, on March 8, 2003.

In response to your request, we are enclosing a Certificate of Proof of Insured Status certifying that Union Savings Bank was an insured depository institution on the date in question. Also enclosed is a duplicate of the insurance certificate most recently issued to this institution, for display at its above-mentioned branch, which was in effect on that date.

Please note that insurance certificates issued to a branch do not recite the specific geographic location of the branch. Instead, all insurance certificates issued to a federally insured depository institution reflect the institution's home/parent office location. This is because an institution's status as a federally insured depository institution encompasses its home office as well as each domestic branch office established by the institution. In other words, an insured depository institution's home office and all of its domestic branch offices are considered to be one entity for federal deposit insurance purposes under the Federal Deposit Insurance Act (FDI Act); funds deposited at a domestic branch office location are insured to the same extent as if they had been deposited at the institution's home office location instead.

Please review the enclosed documents upon receipt to make sure that they satisfy your requirements. If I can be of further assistance in this matter, please let me know.

Sincerely,

Robert E. Feldman
Executive Secretary

Enclosures

## CERTIFICATE OF PROOF OF INSURED STATUS

1. I, Robert E. Feldman, hereby certify and attest that I am the Executive Secretary of the Federal Deposit Insurance Corporation and that I have the official custody of the records of the Federal Deposit Insurance Corporation.

2. I further certify that the attached record pertaining to the admission and history of Union Savings Bank, Freeport, Illinois, is an official record of the Corporation, and is attached hereto as Exhibit "A."

3. I further certify that Union Savings Bank, Freeport, Illinois, has a branch located at 715 West South Street, Freeport, Illinois, established on June 30, 1988, as shown by entry in the official records of the Corporation, a copy of which is attached hereto as Exhibit "B."

4. I further certify that insurance applicable to the main office of Union Savings Bank is applicable to any domestic (U.S.) branch office of Union Savings Bank, including the branch located at 715 West South Street, Freeport, Illinois.

5. I further certify that, after diligent search, no record or entry in the official records of the Corporation has been found to exist which terminated the status of Union Savings Bank as an insured depository institution under the provisions of section 8 of the Federal Deposit Insurance Act, 12 U.S.C. 1818, and that Union Savings Bank, retained

its status as an insured depository institution of the Federal Deposit Insurance

Corporation from August 9, 1989 through and including March 8, 2003.


DATED:    DEC 1 2 2003

    (SEAL)

**071973**

              Robert E. Feldman
              Executive Secretary
FEDERAL DEPOSIT INSURANCE CORPORATION


CITY OF WASHINGTON    )
                  )
DISTRICT OF COLUMBIA )

    I, Bonnie Sue O'Neill, a Notary Public in and for the District of Columbia, hereby certify that Robert E. Feldman, whose signature appears above, is personally known to me, that the said Robert E. Feldman is Executive Secretary of the Federal Deposit Insurance Corporation and has custody of the official records of the Federal Deposit Insurance Corporation which pertain to the insured status of depository institutions, and that the signature above of the said Robert E. Feldman is genuine. I further certify that I have a seal of office and have official duties in the District of Columbia where the said Robert E. Feldman is employed and where the aforesaid official records are kept.

DATED:    DEC 2

    (SEAL)

              NOTARY PUBLIC

          My commission expires:  <u>February 28, 2007</u>

7003 1680 0005 1202 8649

MR. ANTHONY GREEN
REG. NO. 12450-424
FCI. ATLANTA
P.O. BOX. 150160
ATLANTA, GA. 30315

LEGAL MAIL
LEGAL MAIL

TO: CLERK OF THE COURT
UNITED STATES DISTRICT COURT
UNITED STATES COURT HOUSE
211 SOUTH. COURT STREET
ROCKFORD, ILLINOIS. 61101

LEGAL MAIL

